**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 16-10179-IT** |
| | ) | |
| **ALEX HERNANDEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

### INTRODUCTION

In 2015 and 2016, the defendant, Alex Hernandez ("Hernandez"), was in state custody serving a prison sentence as a result of a firearms violation. He was due to become parole eligible at some point in mid-2016. Nevertheless, on December 22, 2015 and again on February 12, 2016, Hernandez met with an undercover federal agent whom he believed was a person that could assist him in obtaining false identity documents. During these meetings, Hernandez reported to the undercover agent that he wanted the false documents so that he could flee the country after assassinating the President of the United States. Hernandez had developed a detailed plan and he shared it with the undercover agent. He had a weapon of choice – assault rifle. He had a plan to shoot the President from a distance like a sniper. He also had a back-up plan involving homemade explosives in case the initial attempt failed. Hernandez had even developed an escape plan with preferred countries he intended to flee to after carrying out the attack. Put simply, Hernandez was a man on a mission prepared to wreak havoc in the United States by assassinating its commander-in-chief.

Hernandez explained that his motivation for attacking the President was his displeasure with the way his Muslims were being treated and how he wanted to support his brothers who were "fighting to uphold the laws and structure of the caliphate" in the Middle East. The

evidence is clear that Hernandez had become radicalized and sought to effect revenge on the United States for what he perceived to be injustices.

On May 23, 2016, Hernandez was arrested and charged with Making Threats against the President, in violation of 18 U.S.C. § 871(a). On May 17, 2017, Hernandez plead guilty to this offense. As part of the guilty plea, the parties entered into an agreement that the government will recommend a sentence of incarceration (concurrent with his state sentence) at the low-end of the Guideline Sentencing Range ("GSR") as calculated by the Court at sentencing. There is disagreement among the parties, however, as to the applicable GSR. At issue is whether a six-level enhancement under the threats guideline is appropriate in this case. If the Court applies the enhancement, the government will request a 60-month sentence. However, if the Court does not apply the enhancement, the government will recommend a 37-month sentence for Hernandez.

For the reasons discussed in greater detail below, the government respectfully requests that the Court apply the six-level enhancement in this case and sentence Hernandez to 60 months in prison.

## DISCUSSION

In determining a defendant's sentence, several steps are necessary. First, the court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range. The advisory sentencing guideline range, once calculated, establishes the court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 50 (2007). Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a). Only after consideration of those factors should the court reach its ultimate determination. *See United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). In weighing the § 3553(a) factors, the First Circuit has emphasized that an individualized determination is, at all times, the touchstone: while a deviation from the

guidelines may be warranted in certain instances; in other instances, it will not be. If the court determines that a sentence below the GSR is warranted, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Gall*, 552 U.S. at 50. The greater the departure, the greater the justification required. *Id.*

## I. Sentencing Guideline Calculations

Probation calculated Hernandez's Total Offense Level as 21 (PSR ¶ 40), and determined that Hernandez falls within Criminal History Category V (PSR ¶ 48). The corresponding GSR would be 70-87 months; however, the statutory maximum term of imprisonment for this offense is five years. Accordingly, Hernandez faces a guideline prison term of 60 months. (PSR ¶ 73). In reaching its total offense level calculation of 21, Probation assigned Hernandez a six-level intent enhancement. (PSR ¶ 31). Hernandez has objected, arguing that his actions cannot qualify as conduct evidencing an intent to carry out the threat to which he plead guilty. (PSR, Addendum, pgs. 25-28). The government and Probation disagree.

A six-level enhancement applies under the threat guideline if an offense involves conduct evidencing an intent to carry out the threat. U.S.S.G. § 2A6.1 (b) (1). In determining whether this enhancement has been triggered, courts are free to consider conduct that took place prior to, during, or after the offense. *See* U.S.S.G. § 2A6.1, App. Note 1; *United States v. Siegler*, 272 F.3d 975, 977 (7th Cir. 2001). The conduct at issue need not be substantial conduct; however, courts require "a nexus…between the defendant's conduct and the threats that form the basis of the indictment." *United States v. Newell*, 309 F.3d 396, 400 (6th Cir. 2002). The purpose of the enhancement is to punish those defendants who act on their threats because that makes them more dangerous; therefore, the "critical issue should not be the timing of the conduct, but

whether the conduct shows the defendant's intent and likelihood to carry out the threats." *United States v. Hines*, 26 F.3d 1469, 1474 (9th Cir. 1994).  Where the totality of a defendant's conduct suggests that he was a "man on a mission," then the enhancement is appropriate.  *Newell*, 309 F.3d. at 403.

A circuit split exists concerning whether a court may impose the intent enhancement based solely on the threats that form the basis of the charge or whether the defendant must engage in some overt activity (beyond the threats themselves) that demonstrates the requisite intent.  *Compare United States v. Bohanon*, 290 F.3d 869, 875 (7th Cir. 2002) (finding threats sufficient), *with United States v. Goynes*, 175 F.3d 350, 355 (5th Cir. 1999) (requiring overt acts evidencing intent).  The First Circuit has recognized this split, but has refrained from taking a position.  *See United States v. Dixon*, 449 F.3d 194, 203 n.3 (1st Cir. 2006).  In *Dixon*, the court found there was no need to address the disagreement between circuits because there were several instances of the defendant's overt acts that qualified as triggering "conduct."  *See id.*

This case is no different from *Dixon*.  Despite Hernandez's assertion that the justification for the enhancement is based entirely on his statements, there is ample conduct (before, during, and after the threat) the Court can rely upon to apply the enhancement.

### A.  **Pre-Threat Conduct**

Courts have consistently determined that related pre-threat conduct can demonstrate a defendant's intent to carry out the threat.  In *United States v. Barbour* for example, the district court applied the intent enhancement where the defendant travelled to Washington D.C. prior to threatening to assassinate the President.  70 F.3d 580, 583 (11th Cir. 1995).  The Eleventh Circuit in *Barbour* outlined certain parameters to consider in determining the relevance of a defendant's pre-threat conduct: (1) "proximity in time between the threat and the prior conduct";

(2) "the seriousness of defendant's prior conduct"; and (3) "the extent to which the pre-threat conduct has progressed towards carrying out the threat." *Id*. at 587. The court further reinforced that the most significant element in the intent enhancement analysis is the nexus between conduct and threat: "If the defendant's acts demonstrate both that he or she intends to act on the threat and is, in fact, likely to do so, then whether those acts occurred before or after the threat should make no difference. *Id.* at 586.

Similarly, *United States v. Taylor* affirmed the holding in *Barbour* and reiterated that relevant pre-threat conduct is applicable in determining the imposition of the intent enhancement. 88 F.3d 938, 943 (11th Cir. 1996). The defendant in *Taylor* stalked his girlfriend for several years before threatening her. *Id.* at 941. The district court imposed the intent enhancement (and the appellate court affirmed) in part based on the fact that prior to the threat, Taylor surveilled the victim, sent her letters, and hired an investigator to obtain information on her. *See id.* at 943.

Here, the evidence shows that Hernandez took numerous steps _before_ making the threats to kill the president – all of which were serious, close in time to the threats, and demonstrate that Hernandez had set in motion and was making progress in his plans to assassinate the President. For example:

- On November 23, 2015, Hernandez wrote to the undercover agent (whose name he believed was Danilo Santos) to introduce himself and indicated that he wanted to meet him. *See* Alex Hernandez November 23, 2015 letter to Danilo Santos, attached hereto as Exhibit A; (PSR ¶ 10). In that letter, Hernandez told the undercover agent "I have some goals that I want to accomplish but we will talk about that when we can see each other[.]" *Id.*

- Prior to the first meeting with the undercover agent, Hernandez acquired (i) an image of Osama Bin Laden; and (ii) documents depicting the U.S. Presidents and containing the hand written notations "kill" underneath all the Presidents that were assassinated while in

office.  *See* Select Items Discovered During December 2015 Search of Hernandez's Cell, attached hereto as Exhibit B; (PSR ¶ 12).

- Prior to the second meeting with the undercover agent, Hernandez acquired (i) an image of the September 11, 2001 attacks on the World Trade Center; and (ii) magazine clippings of images of members of the Islamic State holding assault weapons and the terrorist organization's flag.  *See* Select Items Discovered During February 2016 Search of Hernandez's Cell, attached hereto as Exhibit C; (PSR ¶ 17).

- During the first meeting with the undercover agent, Hernandez made clear that he had *already researched and developed* a detailed plan to carry out his attacks.  *See* Transcript December 22, 2015 Meeting between Hernandez and Undercover Agent, attached hereto as Exhibit D; (PSR ¶¶ 13-16).

  o Hernandez explained that he had been studying to learn sharp shooting, knew where to get a weapon, and had found a place to practice.  Ex. D, pgs. 3-4, 6, and 8.

  o Hernandez told the undercover agent that he has studied books on how to make "booby traps . . . different things . . . like explosives with household items from Home Depot."  *Id.* at 11.

  o Hernandez discussed the attack by using drones "which can carry weight" – suggesting that he had researched drones as part of his plan.  *Id.* at 12.

  o Hernandez also talked about having developed alternative attack plans – Plan A to kill the President and Plan B creating chaos by placing explosives around government buildings.  *Id.* at 14-15.

  o Hernandez demonstrated that he had planned an escape after carrying out the attacks and hoped to flee to a place "that doesn't deport back here . . . [l]ike Brazil[.]" – again suggesting that he had previously researched extradition.  *Id.* at 10.

Each of the above examples are instances of Hernandez's pre-threat *conduct*.  Researching and organizing a plan of attack, reaching out to the undercover agent, amassing examples of prior attacks on the U.S. and its leaders, just as Hernandez did here, is no different than the surveillance and other preparatory steps taken by the defendants in *Barbour* and *Taylor*.  The Court should treat this conduct as evidence that Hernandez's intent to carry out the threat.

6

**B.  Conduct During Threat**

Hernandez's actions during the meetings with the undercover agent also serve as powerful evidence of his intent to carry out the threat.  The purpose of these meetings was clear – to obtain false travel documents and other papers that could facilitate Hernandez's flight after assassinating the President.  Hernandez met with the agent because he believed he could help him accomplish his plan.  Thus, Hernandez's participation in the meetings themselves are examples of conduct evidencing an intent to carry out the threat.

That Hernandez sought the undercover agent's assistance to obtain false documents is made clear throughout both meetings.  For example, within seconds of meeting the undercover agent for the first time, Hernandez began by asking "Uh, anything you can get me?" Ex. D, pg. 1. The undercover agent explained that he could get false papers and Hernandez responded that "[m]ore or less that's what I need." *Id.*  During that meeting, Hernandez also specifically explained that he wanted to travel to a place that did not extradite to the United States and Hernandez raised Brazil as a possibility. *Id.* at 10.

Similarly, during the second meeting with undercover agent, Hernandez and the agent discussed the different types of false documents the undercover agent could obtain. *See* Transcript February 12, 2016 Meeting between Hernandez and Undercover Agent, attached hereto as Exhibit E, pg. 4; (PSR ¶ 21).  They also discussed the sophistication of the false documents and how deep in hiding the defendant sought to be after his attack.  Ex. E, pg. 9; (PSR ¶ 21). The following excerpt demonstrates not only that Hernandez sought the false

documents to flee after carrying out the attack, but also that he wanted sufficiently sophisticated

documents that he could remain under the radar in case he had to commit another attack. [1]

| UCE: | We can put you really, really underground. But it all depends at what extreme you want to be. |
|---|---|
| ALEX: | No, I want to be at a level where I am quiet. |
| UCE: | Quiet and calm. |
| ALEX: | Yeah, because you never know anything – another situation you might have … |
| UCE: | What do you mean? |
| ALEX: | That-that-that you have to-to-to do another job – another one of these. |
| UCE: | OK. So, It's not just here that you don't want this? You would do it somewhere else? |
| ALEX: | Yeah. |

Ex. E, pg. 9; (PSR ¶ 21).

The fact that Hernandez twice met with the undercover agent and engaged in detailed

discussions regarding the services and products the agent could purportedly deliver is conduct

evincing Hernandez's desire and intent to follow carry out his threat.

### C. **Post-Threat Conduct**

Finally, Hernandez's post-threat conduct also demonstrates that his intent was to carry

out the alleged threat.  During the second meeting with the undercover agent, Hernandez

discussed payment terms and offered his Florida firearms contact as potential remuneration.  Ex.

E., pg. 11.  The agent explained that his services typically costs approximately $50,000, but that

he was willing perform the work in exchange for Hernandez weapons contact.  *Id.*  Hernandez

---

[1] Following Hernandez's arrest in May 2016, he was interviewed by FBI and Secret Service agents.  *See* Transcript of May 23, 2016 Interview of Alex Hernandez, attached hereto as Exhibit F.  During that interview, he claimed that he only met with the undercover agent and made the threats at issue because he needed assistance in obtaining a driver's license and other identity documents.  *Id.* at 6.  The agents inquired further about why Hernandez would need assistance from the undercover to obtain a driver's license if he could obtain one legitimately upon leaving prison, but Hernandez did not respond.  *Id.* at 6-8.

agreed and told the agent that in order to get him the weapons contact he needed to reach his cousin "so that she can get his number." *Id.* After making this agreement with the agent, Hernandez attempted to contact the exact person he claimed could put him in touch with a weapons dealer - his cousin Jessica Santiago. Between February 15 and February 17, 2016, Hernandez attempted to reach his cousin telephonically 13 times but was unable to reach her. *See* ITS Call Records Query for Alex Hernandez, attached hereto as Exhibit G. After failing to reach the person that could provide what Hernandez needed to pay for the false documents, he wrote to the cooperating witness and asked him to tell the undercover agent not to come see him again. *See* February 17, 2016 letter to Cooperating Witness, attached hereto as Exhibit H; (PSR ¶ 23).

Although Hernandez may assert the February 17 letter is evidence that he had no intent to carry out the threat, it can reasonably be inferred that his inability to contact his cousin led him to break off his relationship with the undercover agent because he believed he would no longer be able to uphold his side of the bargain and deliver the gun contact. Nevertheless, his relentless efforts to reach his cousin immediately after the second meeting with the undercover agent serves as additional evidence of conduct demonstrating Hernandez's intent to carry out the threat.

Accordingly, the government requests the Court overrule Hernandez's objection and apply the intent enhancement in this case.

## II.  Sentencing Factors Under 18 U.S.C § 3553(a)

The sentencing objectives set forth by Congress in § 3553(a) are best accomplished through the government's recommended sentence. Although other factors may apply, the most significant with regard to Hernandez are the nature and circumstance of the offense, the history

and characteristics of the defendant, the need to promote respect for the law, and the need to afford adequate deterrence and protect the public.

### A. Nature and Circumstance of the Offense and History and Characteristics of the Defendant

In determining the appropriate sentence, the Court should weigh heavily the nature and circumstance of the offense and history and characteristics of the defendant. By all accounts, Hernandez's crime is serious and warrants the government recommended sentence. The evidence regarding Hernandez's plot revealed that despite his incarceration, Hernandez managed to research and develop a detailed plan to assassinate the president and flee the country. Putting aside the question of whether he would have acted on that plan had he been given the opportunity, which the government believes the evidence fully supports, the threats alone caused the government to expend valuable and scarce law enforcement resources to investigating this case and ensuring the safety of the President.

Hernandez's history and characteristics also warrant a strong sentence. The evidence showed that he immersed himself in extremist religious ideology and that he was motivated to commit this crime by a desire to fight for his brothers suffering in the Middle East. He firmly believes that the United States government "is painting it like [extremists] are the bad guys…that we are the bad guys …and [U.S. government] are killing innocents." This fervor for extremist ideas makes him particularly volatile and dangerous.

### B. Respect for the Law

The sentence the Court imposes must promote respect for the law. The court should impose a low-end guideline sentence to demonstrate to the defendant that the laws of the United States must be followed. Hernandez has demonstrated flagrant disrespect for the law. First, the defendant threatened the president while already in prison for a firearms violation. Second, his

boastful behavior regarding his continuous connection to an arms dealer suggests no remorse for the crimes he has committed thus far.

### C. Deterrence and Need to Protect the Public

Lastly, the Court is required to consider what deterrent effects, if any, would be the result of the sentence. In this case, both specific and general deterrence, weigh in favor of the government's recommendation. As noted previously, Hernandez planned the assassination while already in prison for prior criminal activity. Incarceration did not in any way deter the defendant from committing further crimes; rather, Hernandez was willing to die for his cause. Worse yet, the defendant clearly knew that his actions to harm the president was illegal because he planned to flee the country afterwards. By additional incarceration, the Court will send a strong message to others intending to harm public officials that such behavior will not be tolerated.

It is also necessary to consider that, in this case, the defendant is a danger to both public officials and civilians. At multiple points during his conversation with the undercover agent, the defendant's plan extended beyond the president. As noted earlier, the defendant also wanted to place homemade explosives near federal buildings to "create chaos." Hernandez even left open the possibility of committing similar crimes in the future. He is, simply, a loose cannon and a strong sentence is necessary to protect the general population.

### CONCLUSION

For the foregoing reasons, the government respectfully requests the Court apply the six-level intent enhancement and, if applied, sentence Hernandez to 60 months incarceration. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence and protect the public.

11

Respectfully Submitted,

WILLIAM D. WEINREB
Acting United States Attorney

Date: July 19, 2017          By:     */s/ Jordi de Llano*
                                     Jordi de Ilano
                                     Assistant United States Attorney
                                     United States Attorney's Office
                                     One Courthouse Way
                                     Boston, MA 02210
                                     617-748-3100


## CERTIFICATE OF SERVICE


I, Jordi de Llano, hereby certify that the foregoing was filed through the Electronic Court filing system and will be sent electronically to the registered participant as identified on the Notice of Electronic filing:


Date: July 19, 2017                 */s/ Jordi de Llano*

                                    Assistant United States Attorney